## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tri-State Grease & Tallow Co., Inc.,
d/b/a Origo,

                        Plaintiff,

                                              Civ. No. 11-709 (RHK/JSM)
                                              **MEMORANDUM OPINION
                                              AND ORDER**

v.

Milk Specialties Company,

                        Defendant/Third-Party Plaintiff,

v.

Michael Hippert, Bruce Hippert,
and Diane Hippert,

                        Third-Party Defendants.

Dustan J. Cross, Bridget L. Bailey, Ryan D. Christian, Gislason & Hunter LLP, New Ulm, Minnesota, for Plaintiff.

David H. Wright, Stanley E. Siegel, Jr., Benjamin J. Rolf, Nilan Johnson Lewis PA, Minneapolis, Minnesota, for Defendant/Third-Party Plaintiff.

## INTRODUCTION

This action arises out of a non-competition agreement between Plaintiff Tri-State Grease and Tallow Company, Inc., doing business as Origo ("Origo"), and Defendant Milk Specialties Company ("MSC").  After MSC accused Origo of breaching the agreement, Origo commenced the instant action, seeking a declaratory judgment that its actions did not run afoul of the agreement.  MSC counterclaimed, asserting that Origo

had breached the agreement, and it filed the instant Motion for a Temporary Restraining Order or Preliminary Injunction to enjoin the allegedly ongoing breach.  The Motion has been fully briefed, and the Court held oral argument on April 21, 2011.  For the reasons set forth below, the Court will deny the Motion.[1]

## BACKGROUND

MSC is a supplier of animal energy supplements, which are designed to help meet animals' nutritional requirements.  (Tomkins Decl. ¶¶ 2-3.)  It sells two types of supplements:  those made primarily from triglycerides (natural, unprocessed fats), and those made with high levels of free-fatty acids.  (Id. ¶¶ 4-5.)  The latter are particularly important in the dairy industry, because free-fatty acids are more easily digested by ruminants, like cows,[2] as opposed to swine, which better digest triglycerides in their single-chambered stomachs.  (Id. ¶¶ 5-6.)  Nevertheless, some energy supplements for ruminants are made with triglycerides rather than free-fatty acids.  (M. Hippert Decl. ¶ 9.)

To make a free-fatty acid supplement for ruminants, triglycerides go through a splitting process called hydrolyzation, which is designed to break and separate the fatty acids.  (Tomkins Decl. ¶ 7; M. Hippert Decl. ¶ 8.)  This process "typically causes free-fatty-acid products to . . . be darker in color" due to a byproduct of the splitting process which tends to turn brown.  (Tomkins Decl. ¶ 8; M. Hippert Decl. ¶ 9.)  By contrast,

---

[1] The following constitutes the Court's findings of fact and conclusions of law, as required by Federal Rules of Civil Procedure 52(a) and 65.

[2] A "ruminant" is an animal, such as a cow, sheep, goat, or deer, that has a multi-chambered stomach for digestion.  The American Heritage Dictionary 1077 (2d coll. ed. 1985).

energy supplements made from triglycerides are not split and, hence, they tend to be lighter in color.  (Tomkins Decl. ¶ 8; M. Hippert Decl. ¶ 9.)  Split free-fatty acids are later "prilled," or processed into small particles and "spray cooled," for incorporation into energy supplements.  (Tomkins Decl. ¶ 9; M. Hippert Decl. ¶ 8.)

One of MSC's competitors in the animal-supplement market is Origo.  Origo is owned by the Hippert family, including brothers Michael and Bruce Hippert.  (Tomkins Decl. ¶ 10.)  Before 2006, it manufactured both free-fatty-acid and triglyceride energy supplements for ruminants, as well as triglyceride energy supplements for swine, all of which were light in color, at its facility in New Ulm, Minnesota.  (M. Hippert Decl. ¶¶ 7, 17 & Ex. B; B. Hippert Decl. ¶ 5.)  The free-fatty acid ruminant-energy supplements were light in color and not dark because an extra step in the manufacturing process, known as distillation, lightened them.  (M. Hippert Decl. ¶¶ 7, 9, 17.)  In addition, Michael Hippert also owned a separate business, with a similar name, producing dark-colored, free-fatty acid ruminant-energy supplements at a facility in Ohio.  (Id. ¶ 3; see also Tomkins Decl. ¶ 11.)[3]

In 2006, a fire destroyed Michael Hippert's Ohio manufacturing facility and some of his customers, including Cargill, began purchasing energy supplements from MSC.  (Tomkins Decl. ¶ 13; M. Hippert Decl. ¶ 4.)  He then approached MSC and informed it that "he had no further intention of ever getting back into the ruminant-energy-supplement business."  (Tomkins Decl. ¶ 14.)  He asked MSC whether it was interested

---

[3] There appears to be some dispute between the parties whether Michael Hippert's Ohio business was a separate entity or rather was truly a part of Origo.  The Court does not believe this dispute impacts its resolution of the instant Motion.

in buying his business assets, and MSC agreed to do so.  (Id. ¶¶ 14-15.)  According to

MSC, this purchase was "conditional upon [it] being able to ensure that Hippert would

not change his mind and re-enter the business later."  (Id. ¶ 15.)  Michael Hippert,

however, contends that it was never intended for *Origo* to be precluded from continuing

to produce light-colored ruminant-energy supplements at its New Ulm facility.  (M.

Hippert Decl. ¶ 13.)

In early 2007, following lengthy negotiations between the parties, MSC, Origo,

and its then-shareholders – Michael and Bruce Hippert and their mother, Diane – entered

into a Non-Compete Agreement (the "Non-Compete Agreement") at the heart of this

case.  (Tomkins Decl. ¶¶ 17-18 & Ex. A.)  Under that Agreement, MSC agreed to ship

raw materials to Origo's New Ulm facility and it, in turn, would manufacture and

package swine energy supplements for MSC, for which MSC would pay Origo a fee.  (Id.

Exs. A-B.)[4]  In return, Origo agreed that for a period of five years, neither it nor its

shareholders would own, manage, operate, be employed by, or work on behalf of any

company, anywhere in the world, engaged in the "production, marketing or sale of the

Product."  (Id. Ex. A, ¶ 1.)  The Non-Compete Agreement defined the "Product" as

follows:

> For purposes of this Agreement, the "Product" means any prilled product
> destined, or anticipated to be used in or as an energy supplement, for
> ruminants, that is primarily composed of any fat or oil product that is
> composed primarily of free fatty acids at a level above 20%, *that is dark*

---

[4] This arrangement was set forth in a parallel agreement between the parties called the "Toll
Manufacturing Agreement."  (Tomkins Decl. Ex. B.)

*brown or black in color*, including but not limited to, any such product produced by spray cooling (prilling) or spray drying.

(Id. Ex. A, ¶ 2 (emphasis added).)[5]

According to MSC, at the time it entered into the Non-Compete Agreement, it was unaware of any light-colored free-fatty-acid supplement being manufactured anywhere in the United States.  (Id. ¶ 21.)  Michael Hippert, however, claims that he thoroughly discussed with MSC the nature of Origo's business, including its manufacture of light-colored ruminant-energy supplements, before MSC entered into the Non-Compete Agreement.  (M. Hippert Decl. ¶¶ 16, 19.)  He further contends that the agreement was never intended to prevent Origo from continuing to produce light-colored ruminant-energy supplements, as it had always done, and this is precisely why the Non-Compete Agreement expressly applies only to supplements that are "dark brown or black in color." (Id. ¶¶ 16-20 & Ex. B.)

Around the same time Origo and MSC entered into the Non-Compete Agreement, Michael Hippert and MSC also entered into a consulting agreement.  That agreement contained a restrictive covenant precluding him from competing with MSC, but it specifically carved-out his "involvement in [Origo], which is excluded from the Restrictive Covenants."  (Tomkins Decl. Ex. D, ¶ 11(a).)  As part of this consulting agreement, MSC agreed to pay (and did pay) Michael Hippert several million dollars, in exchange for (among other things) Hippert directing his former customer Cargill – and its

---

[5] The Toll Manufacturing Agreement contained a similarly worded non-competition covenant that defined the term "Product" in the same way.

purchases of dark-colored ruminant-energy supplements – to MSC.  (Tomkins Decl. ¶¶ 15, 30.)  The end result was a Memorandum of Understanding between Cargill and MSC, pursuant to which Cargill agreed, for a period of three years, to purchase ruminant-energy supplements from MSC in quantities similar to those it had purchased from Michael Hippert's former business.  (Id. ¶ 23.)

In late 2010, MSC learned that Origo was manufacturing a free-fatty acid ruminant-energy supplement for Cargill at its New Ulm facility.  (Id. ¶¶ 31-36.)  There does not appear to be any dispute that this supplement was not dark brown or black in color, but rather light brown or tan.  (M. Hippert Decl. ¶¶ 12, 18; B. Hippert Decl. ¶¶ 6-7.)  Nevertheless, based on its belief that Origo had agreed to stop manufacturing *all* free-fatty acid ruminant-energy supplements as part of the Non-Compete Agreement, in November 2010 it accused Origo of violating the agreement.  (Tomkins Decl. ¶¶ 39-41; M. Hippert Decl. Ex. B.)  Michael Hippert responded to this accusation by email on December 1, 2010, advising MSC that Origo was not in breach because "the products produced in New Ulm are not dark brown or black in color."  (M. Hippert Decl. Ex. B.) He heard nothing further from MSC for several months.  (Id. ¶ 18.)

Meanwhile, in January 2010, MSC approached Cargill to re-negotiate the terms of the Memorandum of Understanding and expand its purchase of ruminant-energy supplements from MSC.  (Tomkins Decl. ¶ 43.)  It sent several proposals to Cargill, but it received no response.  (Id.)  It is unclear whether Cargill continues purchasing supplements from MSC or whether it intends to do so in the future.  (See id.)

In February 2010, MSC sent a cease-and-desist letter to Origo regarding the ruminant-energy supplements it was producing in New Ulm.  Origo responded by commencing the instant action, seeking a declaration that it has not violated the Non-Compete Agreement because the supplements it makes are light, not dark, in color.  MSC answered and filed counterclaims, alleging *inter alia* Origo's breach of the Non-Compete Agreement, and it also asserted third-party claims against Michael, Bruce, and Diane Hippert for violating the agreement.  It now seeks a temporary restraining order or preliminary injunction enjoining Origo from continuing to breach the agreement.

## STANDARD OF DECISION[6]

A preliminary injunction "is an extraordinary remedy never awarded as a matter of right."  Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008).  This Court must consider four factors to determine whether preliminary-injunctive relief is warranted:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest.  E.g., Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*)).  When analyzing these factors, the Court should "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that

---

[6] MSC's Motion is styled as a motion for a temporary restraining order or preliminary injunction. Because the required showing is the same for both, see S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708-09 (8th Cir. 1989), hereafter the Court refers to the Motion as seeking only a preliminary injunction.

justice requires the court to intervene." <u>Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.</u>, 182 F.3d 598, 601 (8th Cir. 1999).

## ANALYSIS

Having carefully considered the parties' Motion papers and their arguments at the hearing, the Court determines that preliminary-injunctive relief is not warranted here.

## I.    Likelihood of success

The Eighth Circuit has recognized that the "most important of the <u>Dataphase</u> factors is . . . likelihood of success on the merits." <u>Shrink Mo. Gov't PAC v. Adams</u>, 151 F.3d 763, 764 (8th Cir. 1998); <u>accord</u> <u>Mo. Republican Party v. Lamb</u>, 270 F.3d 567, 573 (8th Cir. 2001) (Gibson, J., concurring and dissenting); <u>see also</u> <u>CDI Energy Servs., Inc. v. W. River Pumps, Inc.</u>, 567 F.3d 398, 402 (8th Cir. 2009) ("[T]he absence of likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied."). Likelihood of success, however, does not require MSC to "prove a greater than fifty percent likelihood that [it] will prevail" on its counterclaim for breach. <u>PCTV Gold, Inc. v. SpeedNet, LLC</u>, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting <u>Dataphase</u>, 640 F.2d at 113). Rather, the dispositive question is whether the counterclaim provides a "fair ground for litigation." <u>Watkins</u>, 346 F.3d at 844; <u>accord</u> <u>Planned Parenthood Minn. v. Rounds</u>, 530 F.3d 724, 732 (8th Cir. 2008) (*en banc*) (moving party must show a "fair chance of prevailing" on its claim). The Court concludes that the answer to this question is, "No."

The thrust of MSC's Motion is that the Non-Compete Agreement precludes Origo from making or selling *any* ruminant-energy supplement. (<u>See, e.g.</u>, Def. Mem. at 6

(asserting that Origo "promised not to engage in the production, marketing, or sale of energy supplements for ruminants"); id. at 21 ("Origo . . . agreed in the Non-Compete Agreement that [it] would not produce, market, or sell ruminant-energy supplements for five years.").)  Because Origo is admittedly selling such products, MSC asserts that it is likely to prevail on its counterclaim for breach of the agreement.[7]

MSC's argument, however, ignores the Non-Compete Agreement's express language, which precludes Origo from producing, marketing, or selling ruminant-energy supplements only if they are "*dark brown or black in color.*"  (Tomkins Decl. Ex. A, ¶ 2 (emphasis added).)  There does not appear to be any dispute here that the ruminant-energy supplements now being produced by Origo in New Ulm are *not* dark brown or black, but rather are light brown or tan.  In other words, Origo's ruminant supplements simply do not fall within the scope of the Non-Compete Agreement.  Hence, MSC has not shown it is likely to prevail on its counterclaim.[8]

Perhaps recognizing that the express language of the agreement does not aid its cause, MSC seeks to avoid that language by arguing that the color of Origo's supplement is immaterial, of no nutritional value and "merely an incidental aspect of the

---

[7] In its Reply, MSC clarified that it is seeking to preclude Origo only from manufacturing *free-fatty acid* ruminant-energy supplements, and not other ruminant supplements (such as those made from triglycerides) it manufactures.  This is a distinction without a difference, however, because *none* of the challenged ruminant supplements manufactured by Origo – whether made from free-fatty acids or triglycerides – falls within the scope of the Non-Compete Agreement.

[8] Origo argues that the Non-Compete Agreement is invalid for several reasons, including its length (5 years) and breadth (worldwide).  The Court assumes *arguendo* that the Non-Compete Agreement is valid and enforceable, because even if so, MSC has not proffered sufficient evidence that the agreement has been breached.

manufacturing process." (Def. Mem. at 21-23.) But if that were true, there would have been no reason to include in the Agreement any language at all regarding the color of the supplement. Indeed, had the parties intended to prevent Origo from manufacturing *any* free-fatty acid ruminant-energy supplement, as MSC argues, it would have been simple to say so – the agreement could have restricted Origo from selling "any prilled product destined, or anticipated to be used in or as an energy supplement, for ruminants . . . that is composed primarily of free fatty acids at a level about 20%" and omitted the further, more inclusive "dark brown or black" restriction.

Contrary to MSC's argument, the Court must assume that the color restriction *is* material to the agreement, because "it is presumed that all the provisions of a contract are inserted deliberately and for a purpose." Home & Auto. Ins. Co. v. Scharli, 293 N.E.2d 914, 916 (Ill. App. Ct. 1973); accord, e.g., Encyclopaedia Britannica, Inc. v. Guerrero, 598 F. Supp. 2d 849, 853 (N.D. Ill. 2009) (applying Illinois law); Coles-Moultrie Elec. Coop. v. City of Sullivan, 709 N.E.2d 249, 253 (Ill. App. Ct. 1999).[9] MSC's interpretation of the contract would render the color restriction meaningless. Yet, it is a fundamental tenet of contract law – in Illinois and elsewhere – that contracts should be interpreted to give effect to *all* of their provisions. E.g., Atwood v. St. Paul Fire & Marine Ins. Co., 845 N.E.2d 68, 71 (Ill. App. Ct. 2006) (noting the "well-settled principle of contract construction: a contract must not be interpreted in a manner that nullifies provisions of that contract"); Coles-Moultrie Elec., 709 N.E.2d at 253.

---

[9] The parties agree, for present purposes, that Illinois law, which is specified in the Non-Compete Agreement, governs MSC's counterclaim for breach.

MSC argues, nevertheless, that construing the contract in this fashion would require a "blinkered literalism, a closing of one's eyes to the obvious," which would "ignore[] the intent of the parties" and produce an "absurd result[]."  (Def. Mem. at 22 (quoting <u>Beanstalk Grp., Inc. v. AM Gen. Corp.</u>, 283 F.3d 856, 860 (7th Cir. 2002)).)  It argues that it never would have entered into the Non-Compete Agreement, or the related consulting agreement with Michael Hippert, if Origo could simply "change" the color of its ruminant supplements and compete with MSC.[10]  But the Court cannot conclude, on the present record, that it would be "absurd" to hold MSC to the express language of its bargained-for non-competition agreement.  It may well be the case that Origo intended all along to produce lighter-colored ruminant supplements and made that fact known to MSC, which did not object – indeed, this is precisely what Michael Hippert contends, and that contention finds support in the documents comprising the record before the Court.

Regardless, MSC's argument founders under the weight of another abiding maxim of contract interpretation.  It is no doubt true that the Court must endeavor to ascertain the intent of the parties when interpreting the Non-Compete Agreement.  But "the intention of the parties . . ., when there is no ambiguity in the terms of the [contract], *must be determined from the language of the [contract] alone*."  <u>Bourke v. Dun & Bradstreet Corp.</u>, 159 F.3d 1032, 1036 (7th Cir. 1998) (emphasis added) (alterations in original) (quoting <u>Flora Bank & Trust v. Czyzewski</u>, 583 N.E.2d 720, 725 (Ill. App. Ct. 1991)).

---

[10] Indeed, at oral argument MSC contended that accepting Origo's argument would mean that it could "manipulate" the Non-Compete Agreement by adding food coloring to its supplements, thereby easily avoiding its contractual obligations.  Whatever merit there may be to this contention, there is no suggestion in the record (nor was there any at oral argument) that Origo actually has been doing so here.

Put another way, absent a patent ambiguity, which MSC has nowhere alleged, "the

intention of the parties must be gathered from the face of the [contract] without the

assistance of any parol evidence or any other extrinsic aids." Dribeck Importers, Inc. v.

G. Heileman Brewing Co., 883 F.2d 569, 573 (7th Cir. 1989) (quoting Rakowski v.

Lucente, 472 N.E.2d 791, 794 (Ill. 1984)); accord, e.g., Atwood, 845 N.E.2d at 70 (when

contract "language is unambiguous, we *must apply it as written*, unless it contravenes

public policy") (emphasis added). The Non-Compete Agreement clearly and

unambiguously does not preclude Origo from selling light-colored ruminant-energy

supplements. MSC, therefore, has not shown that it is likely to prevail on its

counterclaim for breach. Bourke, 159 F.3d at 1036 ("[I]f the language of a contract

appears to admit of only one interpretation, the case is indeed over.").

## II.     The remaining factors

In the absence of a showing by MSC that it is likely to succeed on its

counterclaim, the Court's analysis could end. See Oglala Sioux Tribe v. C & W Enters.,

Inc., 542 F.3d 224, 233 (8th Cir. 2008) (declining to address remaining preliminary-

injunction factors after finding plaintiff failed to show likelihood of success).

Nevertheless, the Court will briefly address the remaining Dataphase factors, which it

also believes do not support a preliminary injunction.

### A.     Irreparable harm

"The basis of injunctive relief in the federal courts has always been irreparable

harm and the inadequacy of legal remedies." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190

F.3d 924, 926 (8th Cir. 1999) (*per curiam*) (quoting Beacon Theaters, Inc. v. Westover,

359 U.S. 500, 506-07 (1959)).  Thus, to warrant a preliminary injunction, MSC must demonstrate a sufficient threat of ongoing irreparable harm; the mere possibility of such harm will not suffice.  <u>Winter</u>, 129 S. Ct. at 375-76.  The Court concludes that MSC has failed to show it is likely to suffer irreparable harm absent an injunction here.

MSC claims that it "has lost, and is continuing to lose, unknown amounts of sales of ruminant energy sup[plements] to Origo."  (Def. Mem. at 24.)  It points to Illinois caselaw supposedly standing for the proposition that the "risk of losing customer accounts and sales is irreparable harm justifying an emergency injunction."  (<u>Id.</u> (citing <u>Weitekamp v. Lane</u>, 620 N.E.2d 454, 463 (Ill. App. Ct. 1993)).)  But even in diversity cases such as this, whether to grant a preliminary injunction is determined using federal rather than state standards.  <u>See, e.g.</u>, <u>S. Milk Sales, Inc. v. Martin</u>, 924 F.2d 98, 101-02 (6th Cir. 1991); <u>Ferrero v. Associated Materials Inc.</u>, 923 F.2d 1441, 1448 (11th Cir. 1991); <u>Equifax Servs., Inc. v. Hitz</u>, 905 F.2d 1355, 1361 (10th Cir. 1990).  And federal courts – including this Court – have routinely rejected the proposition that lost sales equal irreparable harm, because they are typically compensable with money damages.  <u>See, e.g.</u>, <u>Reebok Int'l Ltd. v. J. Baker, Inc.</u>, 32 F.3d 1552, 1558 (Fed. Cir. 1994); <u>Mirina Corp. v. Marina Biotech</u>, __ F. Supp. 2d __, 2011 WL 909355, at *8 (W.D. Wash. Mar. 7, 2011); <u>Allina Health Servs. v. Sebelius</u>, __ F. Supp. 2d __, 2010 WL 5175015, at *5 (D.D.C. Dec. 22, 2010); <u>Fiber Optic Designs, Inc. v. Seasonal Specialties, LLC</u>, Civ. No. 05-660, 2005 WL 1593018, at *11 (D. Minn. July 1, 2005) (Kyle, J.), <u>vacated on other</u>

grounds, 172 F. App'x 995 (Fed. Cir. 2006); <u>NewLeaf Designs, LLC v. BestBins Corp.</u>,

168 F. Supp. 2d 1039, 1045 (D. Minn. 2001) (Tunheim, J.).[11]

MSC also points out that "Origo's sales to Cargill are destroying the goodwill

MSC built up with Cargill." (Def. Mem. at 24.) Loss of goodwill may be considered

irreparable harm in appropriate circumstances. <u>See, e.g.</u>, <u>Rogers Grp., Inc. v. City of

Fayetteville, Ark.</u>, 629 F.3d 784, 789-90 (8th Cir. 2010). But here, it appears that the

"damage" to MSC's relationship with Cargill is already done. Indeed, MSC claims that it

"has attempted to negotiate further agreements with Cargill," but the company has been

unresponsive to its overtures. (Def. Mem. at 2; <u>see also</u> Tomkins Decl. ¶ 43.) Under

these facts, the Court concludes that MSC has failed to show a threat of *ongoing*

irreparable harm, rendering injunctive relief inappropriate. <u>See, e.g.</u>, <u>CDI Energy</u>, 567

F.3d at 403 (affirming denial of injunction where harm, "to a large extent, ha[d] already

occurred").

Moreover, the Court, in its discretion, "may choose to require more than a loss of

goodwill to demonstrate irreparable harm." <u>Rogers Grp.</u>, 629 F.3d at 790. Here, the only

customer relationship that MSC claims has been impaired is the one with Cargill. While

undoubtedly an important customer for the company, the Court believes this lone

instance of impaired goodwill does not suffice to show that MSC is being irreparably

injured. Indeed, MSC notes that its sales are expanding, including into many new

---

[11] Irreparable harm may be found in the rare instance where monetary losses "threaten[] the very existence of the [plaintiff's] business." <u>Packard Elevator v. ICC</u>, 782 F.2d 112, 115 (8th Cir. 1986) (citations omitted). MSC has nowhere attempted to make such a showing here.

markets in other countries, undermining the contention that the alleged harm is "irreparable."  (Tomkins Decl. ¶ 3.)  See Travelers Express Co. v. Transaction Tracking Techs., Inc., 305 F. Supp. 2d 1090, 1095 (D. Minn. 2003) (Doty, J.) (denying request for preliminary injunction where plaintiff "enjoyed a period of rapid growth" even after defendant began selling allegedly competitive product).[12]

### B.     Balance of hardships

The balance of hardships also do not weigh in MSC's favor.  Enjoining Origo from producing, marketing, or selling any free-fatty acid ruminant-energy supplements would drive it from the marketplace, to MSC's obvious benefit.  But the clear language of the Non-Compete Agreement suggests that such a result would imbue MSC with *more* than what it bargained for.  In such circumstances, the balance of hardships counsels against injunctive relief.  See, e.g., Internet Inc. v. Tensar Polytechnologies, Inc., Civ. No. 05-317, 2005 WL 2453170, at *7 (D. Minn. Oct. 3, 2005) (Kyle, J.); NewLeaf, 168 F. Supp. 2d at 1046.  This is particularly true where, as here, MSC could have sought a broader Non-Compete Agreement but did not do so.  The Court will not allow MSC to obtain an injunction that would retroactively expand the terms of that Agreement.  See U-Save Auto Rental of Am., Inc. v. Moses, 80 F. App'x 929, 930 (5th Cir. 2003) (*per curiam*).

---

[12] MSC points out that the Non-Compete Agreement contains a clause in which "[t]he parties agree that a breach of this agreement *may* cause irreparable damage."  (Tomkins Decl. Ex. A, ¶ 6 (emphasis added).)  Whatever this clause adds to the mix, it is clear that it is not dispositive of the irreparable-harm inquiry, particularly in light of its permissive ("may") language.  See, e.g., Baskin-Robbins Inc. v. Patel, 264 F. Supp. 2d 607, 611 (N.D. Ill. 2003) (noting that a similar clause, "[w]hile persuasive, . . . is not conclusive in the determination of ongoing irreparable harm").

Moreover, it appears that Origo is a small, family-owned company with few employees (see B. Hippert Decl. ¶¶ 3, 10), while MSC is much larger.  The harm that would befall Origo if enjoined, therefore, is significantly greater than the harm to MSC by permitting Origo to continue manufacturing free-fatty acid ruminant-energy supplements.

**C.     The public interest**

As noted in Internet Inc., "[a]bsent clear evidence of wrongdoing on the part of [Origo], public policy does not support an order enjoining it from . . . competing with [MSC] in the [ruminant-energy supplement] market, and in effect allowing [MSC] to operate without competition from at least one potential competitor."  2005 WL 2453170, at *10; accord, e.g., Benfield, Inc. v. Moline, 351 F. Supp. 2d 911, 919 (D. Minn. 2004) (Davis, J.) (noting that public interest favors competition).  Hence, the public interest does not militate in favor of injunctive relief here.

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERDED** that MSC's Motion for Temporary Restraining Order or Preliminary Injunction (Doc. No. 4) is **DENIED**.

Date:  April 22, 2011

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge